David Lee SANDERS, Appellant,

v.

COMMONWEALTH of
Kentucky, Appellee.

No. 87–SC–674–MR.

Supreme Court of Kentucky.

Sept. 27, 1990.

Rehearing Denied Feb. 14, 1991.

Mark A. Posnansky, Allison Connelly, Asst. Public Advocates, Frankfort, for appellant.

Frederic J. Cowan, Atty. Gen., Rickie L. Pearson, Denise A. Garrison, Asst. Attys. Gen., Criminal Appellate Div., Frankfort, for appellee.

COMBS, Justice.

David Lee Sanders appeals from a judgment of Madison Circuit Court sentencing him to death on each of two convictions for murder and to consecutive twenty year terms of confinement on two convictions of robbery in the first degree.

According to the overwhelming evidence, including his own trial testimony, Sanders, on January 28, 1987, killed and robbed the proprietor of a convenience store, and also killed and robbed a visitor who had happened into the store and upon the crime in

progress. Each victim was shot once in the back of the head. At trial, insanity was offered as the sole defense.

## I. REVIEW OF UNPRESERVED ISSUES

Appellant seeks review of forty-one listed issues, some of which comprise numerous sub-issues, and many of which were not preserved for review pursuant to RCr 9.22 or 9.54. Indeed, more than a few of these questions were not even *raised* below. Except where the trial court has a duty to intervene *sua sponte* to prevent manifest injustice, considerable semantic agility is required in order to assign error to the court respecting issues with which it has not been presented.[1] Where the death penalty has been imposed, we nonetheless review allegations of these quasi errors. Assuming that the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed. *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367 (1989); *Ice v. Commonwealth*, Ky., 667 S.W.2d 671 (1984). All unpreserved issues are subject to this analysis.

## II. JURY SELECTION

Appellant contends that a number of errors compromised the integrity of the jury selection process. Claiming that he was denied an impartial jury and due process of law, appellant names eight members of the jury panel who he argues should have been excused for cause, but were not. Trial counsel objected to only

---

1. Generally, once a judgment has become final, such issues constitute a collateral attack upon the judgment imposing sentence, and must be

three of the eight.[2] None of those three, and only one of the five challenged for the first time on appeal, sat on the final jury. It is elementary logic and sound law that a defendant's right to be tried by an impartial jury is infringed if and only if an unqualified juror participates in the decision of the case. *Randolph v. Commonwealth*, Ky., 716 S.W.2d 253 (1986); *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 (1988); *Ross v. Oklahoma*, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).[3]

■ In the present case, therefore, our attention focuses first on the one allegedly objectionable panelist who became a member of the final jury. The juror under scrutiny visited the bench twice in response to questions during general voir dire, and was also examined in individual voir dire. He advised the court and counsel that, although he did not know her well, he and the wife of one of the victims were employed at the same hospital, he as a respiratory therapist on the third shift, and she as a business office employee on the day shift. He added that he had been introduced to her husband at a Christmas party. This juror further volunteered that he had heard some talk about the crime at the hospital, and had read some accounts, not amounting to much, in the newspaper. Counsel for the defense inquired of the juror whether his verdict might be affected due to his acquaintanceship with the wife of the victim, and, evidently satisfied with a negative response, declined to challenge for cause, or by peremptory strike.

In light of the record, we see nothing amiss in the proposition that counsel reasonably and responsibly found this juror to be competent, qualified, and impartial. Moreover, had the trial court been presented with a motion to excuse this juror for cause, we are not persuaded that denial of

such motion would have amounted to an abuse of discretion. The juror disclaimed any bias. In our view, the facts that he had a passing acquaintance with the victim and the victim's wife, and a passing familiarity with the reported circumstances of the crime, are insufficient to demonstrate a probability of prejudice. Certainly the relationship here is of much less import than that in *Pennington v. Commonwealth*, Ky., 316 S.W.2d 221 (1958), where the juror was a first cousin to the prosecution's key witness, or that in *Randolph v. Commonwealth*, Ky., 716 S.W.2d 253 (1986), where the juror in question was an employee of the Commonwealth's Attorney. Nor do we find here significant additional circumstances implying bias, as was the case in *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 (1988), where a juror was first cousin by affinity to a key prosecution witness, and in addition responded on voir dire that he would have to lean toward what that witness might say. *Cf. Marsch v. Commonwealth*, Ky., 743 S.W.2d 830 (1988); *Peters v. Commonwealth*, Ky., 505 S.W.2d 764 (1974). We conclude that the lately contested seating of the juror in the present case deprived the defendant neither of trial by an impartial jury nor due process of law.

■ The appellant also complains, with some justification, that the trial judge commented to the prosecutor, *ex parte*, that this same juror was "dying to get on." This brief remark casually conveyed a subjective opinion as to the juror's attitude toward service (an attitude as discernible by counsel as by the court); it conveyed no opinion that the juror was disposed either to serve and convict, or to serve and acquit. While we do not condone the comment, we are unable to perceive in it any prejudice to

---

presented to the trial court pursuant to RCr 11.42.

**2.** The fact that counsel moved to exclude *some* prospective jurors certainly permits the inference that the others, unchallenged, were accepted by the defense as a matter of considered trial tactics. Where the competency of a juror is raised for the first time on appeal, and where, as here, the record fails to demonstrate an obvi-

ous bias antagonistic to the interests of the defendant, an appellant faces an enormous burden to establish that trial counsel's decision to accept the juror was not a reasonable exercise of professional judgment.

**3.** "Any claim that the jury was not impartial ... must focus not on [the stricken juror], but on the jurors who ultimately sat." *Id.*, 108 S.Ct. at 2277.

defendant's rights to due process, a fair trial, or rational sentencing.

■ We next examine the three potential jurors whom the defense unsuccessfully challenged for cause. The first of these stated on voir dire that he could decide the case solely upon the evidence heard in court, and could consider all penalty options and impose sentence according to the evidence. He further affirmed that he could follow the court's instructions. The court then asked whether there was any reason why the juror could not be fair and impartial. He replied, "Only that I've been robbed myself with a gun put to my head ... I'm a little paranoid over that, I think." When asked whether his experience would prevent him from being fair and impartial he replied, "I would hope not, but I never know." Defense counsel inquired whether, if a case involved a gun pointed at the victim's head and a robbery, the juror thought he could be objective and fair, to which he replied, "Well, you always think you can be objective. People with mental problems think they can be objective, but they aren't." Pursuing the possibility of bias, the court asked whether the juror could set aside whatever feelings he might have as a result of being a robbery victim and render a decision in this case upon the evidence heard. The juror replied, "I think I've come out of the trauma." The court, apparently satisfied that this juror was qualified, overruled the defendant's challenge for cause. Having reviewed the interrogation, we are unable to conclude that the trial court's ruling was clearly erroneous and an abuse of discretion. *Peters v. Commonwealth*, Ky., 505 S.W.2d 764 (1974); *Scruggs v. Commonwealth*, Ky., 566 S.W.2d 405 (1978); *Caldwell v. Commonwealth*, Ky., 634 S.W.2d 405 (1982).

■ A second potential juror stated on voir dire that, as a member of the Berea Police Department, he had seen a teletype message alerting the department to look for a Chevrolet Blazer which reportedly had been seen in the vicinity of the crimes. He stated that he had no other involvement with the investigation, and did not know who owned the Blazer. (He added that his judgment would not be affected if it were to be shown that the defendant was driving that vehicle.) Upon further questioning, this juror acknowledged that he was acquainted with two of the three officers expected to testify for the Commonwealth. When asked by the court whether he would give more weight to the testimony of these officers, he responded that he would listen to all the evidence and give it all equal weight. He added that he had no information concerning the case and was not involved in any investigation with any officer expected to testify for the Commonwealth.

We cannot agree with the appellant that this juror "participated in the investigation" in any substantial way. The fact that he was a law enforcement officer was not sufficient reason to excuse him for cause. *Smith v. Commonwealth*, Ky., 734 S.W.2d 437 (1987). Nor does the fact that the juror was acquainted with the officers who would testify for the Commonwealth establish bias as a matter of law. We conclude that the trial court did not abuse its discretion in denying the defense motion to excuse this juror for cause.

■ A third juror disclosed upon voir dire that he was acquainted, through his business, with one of the victims in the case. He stated that he had liked the victim, but also described the relationship as a casual one. When asked by the defense whether he had an opinion as to the guilt or innocence of the accused, the juror replied, "Oh, no." Responding to the court, he indicated that he thought he could be fair and impartial, regardless of his relationship with the victim.

The record does not persuade us that this juror had such a close situational relationship with the victim as to compel a presumption of bias. *See Ward v. Commonwealth*, Ky., 695 S.W.2d 404 (1985); *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 (1988). The trial court's ruling on the defense motion to excuse for cause was not clearly erroneous.

Having concluded that the trial court's actions in this sphere were not in error, we do not reach the question of whether the appellant's use of peremptory strikes to

remove these three jurors deprived him of a substantial right provided by state law or denied him due process. *Cf. Ross v. Oklahoma, supra.*

■ Appellant asserts various other errors and irregularities said to have occurred during the jury selection process. During voir dire the prosecutor posed the following questions:

In a criminal trial, do you realize that the Commonwealth has the burden of proving the defendant guilty beyond a reasonable doubt, that does not mean beyond all doubt or a shadow of a doubt? Would any of you all hold the Commonwealth to a higher standard of proof than the reasonable doubt standard?

Appellant now insists (although the issue was not preserved by contemporaneous objection) that within the first quoted question lies an attempted definition of the phrase "reasonable doubt," in violation of the rule established in *Commonwealth v. Callahan,* Ky., 675 S.W.2d 391 (1984), that "all counsel shall refrain from any expression of the meaning or definition of the term 'reasonable doubt.'" Assuming, without deciding, that an error would have occurred had objection been raised and overruled,[4] we are wholly unconvinced, considering the circumstances, that absent this putative error the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.

■ Appellant further submits that the trial court improperly restricted defense counsel's examination of two prospective jurors during individual voir dire. In the first instance, the juror indicated in response to questions from the court that he was "not much for capital punishment at all," and that "I don't think I can give someone death." Following the prosecutor's motion to excuse for cause, defense counsel, in an apparent attempt to rehabilitate the juror, asked if he could impose the

death penalty against "an individual like Charles Manson." Objection to this question was sustained, in keeping with the rule of *White v. Commonwealth,* Ky., 671 S.W.2d 241 (1984). Defense counsel then asked if the juror could think of any situation bad enough to justify the death penalty; the reply was that he could not, whereupon the Commonwealth's motion to excuse for cause was granted. It seems to us eminently clear that counsel's question regarding Charles Manson was correctly disallowed, and moreover that the information concerning the juror's attitude toward the death penalty sought to be elicited by the question was made perfectly plain by his response to counsel's ensuing question.

■ In the second instance a prospective juror responded to an inquiry of the court that he could consider all four sentencing options in the event of a conviction for murder. Upon questioning by the Commonwealth, the juror stated that he was in favor of the death penalty if guilt were proven beyond a reasonable doubt, and agreed with the prosecutor's leading amendment, "If the facts merit it?" Defense counsel asked whether the juror would lean toward imposition of the death penalty, as opposed to the other sentencing options, if a person were found guilty of double murder. An objection was sustained upon the grounds that the question posed a hypothetical situation. *See White v. Commonwealth, supra.* Defense counsel then asked, assuming that a defendant was convicted of murder, "Would you be more than likely to give the death penalty?" The Commonwealth objected to the phrase "more than likely," suggesting that the proper standard should be whether the juror would "automatically" vote for the death penalty. Without ruling on the objection, the court asked the juror what it considered to be the correct question: "Do you feel that there are certain cases where a murder might be involved where twenty

---

**4.** In *Callahan* the prosecutor's remarks included: "When I went to college I had some teachers that could practically prove to you that we weren't even here today. But that's not what reasonable doubt is. The judge has instructed you ... as to what reasonable doubt is and you read that and follow it." (In fact, the trial court had given no instruction on reasonable doubt, in accord with RCr 9.56.) This Court decided that the comments of the prosecutor did not constitute any attempt to define reasonable doubt.

years might be appropriate, certain cases where life in prison might be appropriate, certain cases where life in prison without parole for twenty-five years might be appropriate, and other cases where the death penalty might be appropriate?" The juror answered that after hearing the evidence and the court's instructions he would weigh all of the options. The court further inquired whether, in a murder case, the juror would recommend only the death penalty, to which the juror responded, "No ... I'd just have to hear the evidence, how the crime was committed, and all that first."

Because the defendant was to be tried simultaneously on two charges of murder, we believe that counsel's question regarding conviction of "double murder" was proper, and the juror should have been allowed to answer.[5] However, we are convinced that the trial court's careful and detailed inquiries, and the juror's definite responses to the effect that his decision would depend upon the evidence and the court's instructions, served to eradicate any possible prejudice to the defendant, and to demonstrate that this juror was in fact qualified.

■ Appellant further argues that the practice, exercised in this case, of removing for cause jurors definitely opposed to the death penalty is unconstitutional. We cannot agree. On the contrary, a venireman who cannot fairly and conscientiously consider the entire range of statutory penalties, in compliance with his oath and the instructions of the court, is not impartial, and should be excluded from the jury as not qualified to serve. *See Stanford v. Commonwealth*, Ky., 734 S.W.2d 781 (1987); *Moore v. Commonwealth*, Ky., 771 S.W.2d 34 (1989); *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581

(1980); *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).[6]

■ The appellant also objects (for the first time on appeal) to the prosecutor's use of peremptory challenges to remove six jurors who had expressed receptiveness to the defense of insanity. The contention is that the prosecutor's action violated the appellant's rights to due process and an impartial jury drawn from a fair cross section of the community. Appellant would analogize the present situation to that in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), where it was held that the prosecution may not exercise peremptory challenges for the discriminatory purpose of eliminating from the jury members of the defendant's race.

We begin by noting that the constitution does not require that a petit jury represent a fair cross section of the community. As stated by the United States Supreme Court in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986):

> We have never invoked the fair-cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large.

*Id.*, 476 U.S. at 173, 106 S.Ct. at 1765.

Recalling that we have already determined, *supra*, that the jury which decided the present case was impartial, we are satisfied that our determination comports with the standard expressed by the *Lockhart* court:

> [T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of

---

**5.** *See Morris v. Commonwealth*, Ky., 766 S.W.2d 58 (1989). There the trial court forbade the use of the word "intentional" in questioning by defense counsel. We said, "this thwarted questioning relating to the sole crime with which [defendant] was charged, that of intentional murder."

**6.** "In this case we address the question left open by our decision nearly 18 years ago in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20

L.Ed.2d 776 (1968): Does the Constitution prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial? ... We hold that it does not." *Id.*, 476 U.S. at 165, 106 S.Ct. at 1760.

the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case. *Id.*, 476 U.S. at 184, 106 S.Ct. at 1770.

What remains of the appellant's argument, then, is a tenuous analogy with *Batson.* We do not deem either the holding or the rationale in *Batson* to be so broad as to apply to the exercise of peremptory challenges to remove jurors who share, among themselves and with the defendant, a sympathetic attitude toward a particular legal defense. The illegitimate tactic condemned in *Batson* was based upon the immutable characteristic of race shared by the defendant and the challenged jurors, and bore no morally or ethically cognizable relationship to the desirability or undesirability of the jurors, as jurors. It is inconceivable that the equal protection principles underlying the *Batson* decision extend to persons especially disposed to consider an insanity defense.

■ Finally, with respect to jury selection, appellant alleges that the procedure employed by the trial court in selecting the jury substantially deviated from the requirements of RCr 9.36 and KRS 29A.060(2), with the result that the defendant was denied due process of law and his right to a fair trial. The trial court intended to seat a jury of twelve, plus two alternates, and to allow seventeen peremptory challenges, and therefore needed to qualify thirty-one jurors. At the conclusion of individual voir dire, forty jurors were qualified. Of these, the court seated thirty-one in the order in which they were originally called. Appellant contends that the court was required to place all forty names in the box and draw thirty-one randomly.

It may be conceded that the trial court's procedures deviated somewhat from those prescribed by rule and statute. We believe that the mischief lay in the decision to qualify forty potential jurors rather than thirty-one. See KRS 29A.060; RCr 9.30(1)(a); Administrative Procedures of the Court of Justice, Part Two, Section 12. Our fundamental objective is to preserve

randomness in the selection of the legal jury, up to the point where peremptory challenges may be exercised. It is certainly arguable that qualification of "too many" jurors permits the court unduly to influence the composition of the legal jury, especially if the court has the option of eliminating the excess number by lot or by numerical order.[7] However, it is clear that the potential for abuse demonstrated in the instant case is minuscule when compared to that presented in the case of *Robertson v. Commonwealth,* Ky., 597 S.W.2d 864 (1980), relied upon by the appellant in urging reversal. Moreover, we note that defense counsel was informed by the court prior to trial that more than thirty-one prospective jurors would be death-qualified, and that counsel objected to the procedure neither at that time nor at the time of trial. In addition, counsel failed to object to the numerical seating of the first thirty-one jurors called as opposed to a random selection of thirty-one from the forty who qualified. It is quite reasonable to believe that counsel, who had questioned all forty on voir dire, concluded that the first thirty-one jurors were as desirable as, or more desirable than, the nine who were excused. Under the circumstances, we believe it incumbent upon appellant to demonstrate that he was prejudiced by the method of jury selection employed by the trial court, not only because of our rule that unpreserved issues require a showing of prejudice, but also because the rule of *Robertson v. Commonwealth, supra,* requires reversal as a matter of law only where there is a substantial irregularity in the jury selection process *and* where the error is preserved. In the present case the first thirty-one jurors who qualified were seated; the result was the same as if the jury selection procedures required by rule and statute had been followed exactly. It is therefore impossible for the appellant to demonstrate any prejudice, and the irregularity in the procedure was harmless beyond all doubt.

### III. TRIAL—GUILT/INNOCENCE PHASE

Appellant assigns error to the admission, during the Commonwealth's case in chief,

---

7. We hasten to say that in the present case we ascribe no prejudicial motive to the trial court.

of evidence implicating the defendant in a separate crime. Approximately one month prior to the events for which the defendant was on trial, in late December 1986, the proprietor of a bait shop in Lincoln County had been shot in the back of the head with a .25–caliber weapon, and robbed. Subsequent to the Madison County crimes, it was determined that one of the Madison County victims had been shot with the same gun. Following his arrest in connection with the Madison County incident, the appellant, after a series of blanket and then partial denials, stated to investigating officers that he had indeed committed the acts in both Lincoln and Madison counties. He indicated that both incidents had occurred in essentially the same way: he had parked his vehicle outside the store, gone inside and conducted a minor transaction, exchanging casual remarks with the person within, returned to his vehicle and gotten the gun (in Madison County two guns), re-entered the store, shot the victim in the back of the head, and taken money. In each case, the appellant claimed that he was powerless to control his actions. He indicated that he did not know why he had committed the acts, offering that he did not need money. It was as if, he said, that he were outside of his body, watching himself, unable to stop. At the time of trial, the appellant had not been tried for the Lincoln County crime.

In a pretrial motion *in limine*, the defendant asked that the Commonwealth not be permitted to introduce evidence respecting the events in Lincoln County. The trial court denied the motion, on grounds that the evidence was admissible to show intent or common scheme or plan. In the course of the Commonwealth's case in chief, the jury heard evidence of the Lincoln County crime, including investigative details of that crime, and the defendant's recorded statement, wherein he both confessed to the act, and denied a capacity for self-control. On two occasions, the trial court admonished the jury:

Ladies and gentlemen of the jury, the testimony you've heard concerning acts or conduct of the defendant upon another occasion in December in Lincoln County

is to be considered by you only in as far as it may tend to show, if you believe it does, knowledge or intent or pattern of conduct on the defendant's part.

It is contended on appeal that the evidence in question was irrelevant to any issue in the Madison County case; that such evidence was admissible, if at all, only on rebuttal; and that in any event the evidence of an independent crime was presented in unnecessary detail. In general, evidence of other criminal acts of an accused is inadmissible except in certain well-defined circumstances. *See Jones v. Commonwealth*, 303 Ky. 666, 198 S.W.2d 969 (1947); *Pendleton v. Commonwealth*, Ky., 685 S.W.2d 549 (1985). On the other hand, relevant evidence which is probative of an element of the crime charged is admissible, even though it may tend to prove the commission of other crimes. *Pendleton, supra; Jones v. Commonwealth*, Ky., 554 S.W.2d 363 (1977). As this Court stated in *O'Bryan v. Commonwealth*, Ky., 634 S.W.2d 153 (1982):

Evidence of the commission of crimes other than the one charged is admissible if, (1) it is offered to prove motive, intent, knowledge, identity, plan or scheme, or absence of mistake or accident; (2) such evidence is relevant to the issues other than proof of a general criminal disposition; and (3) the possibility of prejudice to the accused is outweighed by the probative worth and need for the evidence.

In a criminal prosecution, the Commonwealth bears the burden of proving each element of the statutory offense beyond a reasonable doubt. KRS 500.070. Intent is an element of the crime of intentional murder, and of the crime of robbery in the first degree. KRS 507.020(1)(a); KRS 515.020 and 514.030. Moreover, identification of the defendant as the perpetrator of the crime charged is an essential element in any criminal prosecution.

The record discloses a remarkable similarity between the respective crimes in Madison and Lincoln counties. In each, a victim, alone in a rural shop or store, was shot in the back of the head and robbed. The

same weapon was used in both crimes. Witnesses reported having seen a blue Chevrolet Blazer in the vicinity of each offense at the critical time. In addition, in the last of his disparate statements to investigators, the appellant's description of the crimes indicated a common modus operandi. In *O'Bryan, supra,* we stated the standard for the admissibility of evidence respecting a common scheme or plan:

> Before evidence of other crimes can be admitted to show a scheme, plan or system, the evidence ·must show acts, circumstances or crimes similar to, clearly connected with, and not too remote from the one charged.

In light of the *O'Bryan* standard, we are unable to conclude that the trial court abused its discretion in admitting the evidence concerning Lincoln County crime.

Nor can we agree with appellant that the evidence in question was admissible only on rebuttal. In the circumstances of this case, the common scheme or plan attributed to the defendant was probative both as to the identity and as to the intent of the perpetrator of the Madison County crimes. The evidence strongly indicated that both offenses were committed by the same person, making relevant to the present trial evidence that the defendant had committed the acts in Lincoln County. Moreover the similarity of results tends to establish that the offender intended to shoot and to rob the Madison County victims. Both identity and intent being elements which the Commonwealth must prove beyond a reasonable doubt in order to obtain a conviction, the evidence was properly admissible during the Commonwealth's case in chief.

We likewise cannot agree with the appellant that the evidence concerning the Lincoln County crime was presented in excess detail. If evidence of other crimes is admissible to show intent or identity or a common scheme or plan, the jury must weigh such evidence for what it is worth in establishing an element of the offense charged. The probative weight of that evidence is directly related to the degree of likelihood that the defendant actually committed the extrinsic acts alleged. In sum,

we are of the opinion that the trial judge acted within the scope of his sound discretion in admitting the evidence, under admonition as to its limited purpose.

Appellant further complains, but did not object below, that the victim of the Lincoln County shooting, confined to a wheelchair, was present in the courtroom during the last day of the guilt/innocence phase of the trial. It is not alleged, and the record gives no indication, that any member of the jury was at any time aware of the victim's presence or identity. We therefore see no appreciable possibility that the jury was affected by her presence, or that the defendant suffered prejudice to his substantial rights.

■ It is also maintained that the Commonwealth improperly elicited from appellant's wife irrelevant and prejudicial testimony to the effect that he had struck her on one occasion, and had tried to smother her with a pillow on another. Mrs. Sanders was called by the Commonwealth during its case in chief. On cross examination, defense counsel asked, among other things, whether her marriage to the defendant had been very happy, to which the witness replied affirmatively. Counsel also inquired whether the witness had any reason to think that the appellant would be capable of being involved in the crimes with which he was charged. The witness responded that she did not, and added that there was no way that her husband could hurt anyone or do anything against anyone. In response to redirect examination, the witness offered the testimony now objected to; on recross she explained that the incident when the defendant struck her was mostly her fault, in that she had provoked him, and added that the smothering incident was inexplicable, but that her husband had hated himself afterwards.

We see Mrs. Sanders' testimony during cross examination by the defense as substantially responsive to the questions posed, and as opening the door to the redirect examination conducted by the Commonwealth. Had the trial court been presented with an objection, therefore, ad-

mission of this challenged testimony would not have constituted an abuse of discretion.

■■■ Over objection, the Commonwealth was allowed to introduce, through the pathologist, a total of six photographs of the two victims of the Madison County crimes. The appellant argues, as he argued at trial, that these photographs were irrelevant to any real issue in the case, in that there was no dispute about the fact that the defendant had shot and killed the two victims; he submits that the photographs only served to inflame the jury and to distract it from the real disputed issue, the sanity of the defendant. But, where a defendant has pled not guilty, it is indispensable to the Commonwealth's case to establish that a crime has in fact been committed. We agree with the trial court that the selected photographs offered into evidence were not gruesome or unduly prejudicial, but constituted relevant and probative evidence of the circumstances of the crime; we find in their admission no abuse of discretion.[8] Cf. Gall v. Commonwealth, Ky., 607 S.W.2d 97 (1980).

■■■ Appellant argues, as an unpreserved issue, that a Kentucky State Police detective, on redirect examination by the Commonwealth, offered an opinion on what was to become the ultimate issue in the case, i.e., the defendant's sanity at the time of the offense. As we have noted, the defendant had given various and contradictory statements regarding his knowledge of the crimes. On direct examination the detective recounted these statements, including the final one to the effect that the defendant had indeed committed the criminal acts, but had been unable to control himself. On cross examination, the detective, asked by defense counsel whether he believed the defendant's last version of events, replied that most of it had "made sense," whereas the earlier stories had not. On redirect, the prosecutor inquired whether the statement made sense to the witness with regard to the concrete facts related,

or with regard to the defendant's reported state of mind. The witness replied:

> Witness: I can't honestly say that I still believe that of what he was saying.
>
> Prosecutor: Did that part of it make sense?
>
> Witness: That's not what I meant that made sense, no. The part about the way the crime occurred ... makes sense....

In our view, the questioning by defense counsel on cross examination initially solicited an opinion from the witness; moreover, this questioning appears to have been a reasonable, calculated trial tactic. The Commonwealth legitimately pursued the matter within the proper scope of redirect examination, and created no reversible irregularity.

■■■ The appellant testified in his own defense. On direct examination, he stated that after his arrest he had told his attorney not to request bail. Defense counsel then asked the defendant why he had made this choice. The prosecutor's objection to this question was sustained. The defense did not offer to show by avowal what the defendant's answer would have been, but submits on appeal that the trial court's ruling constituted reversible error, and denied the defendant due process of law.

Even assuming that the trial court's ruling was in error, we are unable in the absence of an avowal to conclude that the defendant was prejudiced. See Robertson v. Commonwealth, 269 Ky. 317, 107 S.W.2d 292 (1937); Cooley v. Commonwealth, Ky., 459 S.W.2d 89 (1970). Appellant urges the assumption that the defendant would have given testimony to the effect that he knew he suffered from a mental abnormality, and had wanted to remain confined out of fear that otherwise he might again lose control of his behavior and harm someone. This self-serving testimony, even if admissible, would have been of insignificant weight, and the defendant

---

8. The photographs erroneously admitted in the case of Holland v. Commonwealth, Ky., 703 S.W.2d 876 (1985), relied on by appellant, were of a very different nature. They depicted extensive animal mutilation of the corpse occurring subsequent to the murder, and did not "elaborate on the nature of the victim's injuries...." Id., at 880.

incurred no substantial prejudice as a result of its exclusion.[9]

■ During his direct testimony, the defendant portrayed the crimes essentially as he had done in his last statement to investigators, admitting that he had committed the acts, but asserting that he had no control, that it was as if he were outside of his body, watching. Appellant asserts, in another issue not preserved, that the prosecution upon cross examination mocked and denigrated the defense. Among the prosecutor's questions were: whether the defendant was floating in the courtroom; whether the defendant was in a second life; whether he was at present under a spell; whether he was in a cloud; whether he was at present the bad David Sanders, or the good David Sanders. While the prosecutor's tone and attitude may have been less than exemplary, his questions substantially and not unfairly addressed a crucial issue which had been raised on direct examination. The prosecutor's conduct in the present case does not approach the egregious misconduct condemned in the decision of *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 (1988).

■ Appellant further complains that the prosecutor cross examined him at length concerning lies contained in his various statements made to police. These statements, introduced by the Commonwealth during its case in chief, included one wherein the defendant had denied any knowledge of the crime, one wherein he alleged that the crimes had been committed by a hitchhiker whom he had picked up, another stating that the defendant and the hitchhiker had jointly committed the crimes, and a final statement admitting the acts but denying volition. In each succeeding statement, the defendant admitted that he had lied in the preceding one. Even had the defense objected at trial to the cross examination now complained of, nothing in the record persuades us that the trial court would have erred in permitting the questions. Once he has taken the stand and testified, a defendant's credibility is properly subject to impeachment by cross examination.

Similarly, because the defendant testified on direct examination that he had "a very happy marriage," and further testified as to an incident involving his wife's ex-husband, the prosecutor's questions regarding one occasion when the defendant struck his wife, and another when he attempted to smother her, and regarding the defendant's confrontation with the ex-husband, while perhaps borderline, were not clearly beyond the scope of proper cross examination.

■ Presenting yet another issue which would ordinarily be unreviewable because not preserved, appellant maintains that the testimony of the state psychiatrist, introduced by the Commonwealth in rebuttal, contained inadmissible hearsay, bolstered the witness's own credibility, and included an inadmissible lay opinion. The doctor testified extensively concerning her evaluation of the defendant at the Kentucky Correctional Psychiatric Center, to which he had been referred prior to trial. Responding to a question as to whether she had observed any efforts by the patient to manipulate the people working with him, the doctor stated, in part:

> The Chaplain spent a great deal of time with him attempting to counsel him. And it appeared that he came up with feelings that would indicate that he was sorry or whatever only at the urging of the Chaplain. The Chaplain commented that the patient did not appear to have a true regard for the victims, that he did not appear to have a true remorse. When the Chaplain would talk with him and maybe almost put words in his mouth, the patient would ... say he did. So we did feel that he had tendencies to be a manipulative type of person.

It is the appellant's position that the comments attributed to the Chaplain are inadmissible hearsay, and furthermore that the subject of remorse was irrelevant to the issue of guilt or innocence.

9. In any event the fact that the defendant had asked that he not be released *was* admitted, and the jury was as capable as the appellant or this Court of inferring a beneficent motive.

In *Buckler v. Commonwealth*, Ky., 541 S.W.2d 935 (1976), this Court adopted the following exception to the hearsay rule:

[A]n expert may properly express an opinion based upon information supplied by third parties which is not in evidence, but upon which the expert customarily relies in the practice of his profession.

. . . . .

We emphasize that the type of information which can be utilized by the expert in forming his opinion should be only that produced by qualified personnel and on which the expert would customarily rely in the day-to-day decisions attendant to his profession.

While the defendant, by timely objection, might have required the Commonwealth to establish that the Chaplain was a qualified person, and that the doctor customarily relies upon him in the practice of her profession, the earlier testimony of the psychiatrist indicates that the proper foundation could have been satisfactorily laid. The doctor had testified that a team approach was used to evaluate the defendant at KCPC. The quoted testimony fairly implies that the Chaplain regularly counsels KCPC patients, and is a qualified member of the team upon whom the psychiatrist ordinarily relies. We should of course prefer to have these inferences clearly confirmed by the record, but in the absence of an objection by the defendant, we conclude upon the record as it is that the doctor's testimony in this regard was acceptable.

And, while the subject of the defendant's remorse, in isolation, may well be irrelevant to the question of guilt or innocence, the record indicates that the question of remorse in the context presented was relevant to the psychiatrist's conclusion that the defendant is a manipulative type of person, which question in turn is clearly relevant to a determination of whether the patient in fact suffered from a mental disease or defect, or whether on the other hand he was a malingerer. This latter issue being crucial in the guilt/innocence phase of trial, the evidence as to the defendant's remorse, *vel non*, was relevant and admissible.

The appellant's contention regarding the expert's bolstering of her own credibility does not merit discussion.

■■■ Appellant also finds impropriety in the following testimony, unchallenged at trial:

Prosecutor: Did you find any explanation for why he did what he did?

Psychiatrist: Yes, but not a psychiatric one . . .

Well, the only explanation I could come up with after the extensive evaluation that we did was . . . just the money . . . the obvious motives that you would find as an investigator. We did not find any kind of a psychiatric explanation for why the person would have committed the crimes.

The obvious import of this testimony is that, in the expert's opinion, the defendant had not committed the crimes while suffering from a significant mental disease or defect. This opinion was entirely proper in rebuttal to the preceding testimony of the defense psychiatrist, that in his opinion the defendant was insane at the time of the offenses. In the absence of a diagnosed psychiatric abnormality, the state psychiatrist was left with no explanation for the defendant's acts other than "just the money," and "the obvious motives that you would find as an investigator." While these latter remarks may have been technically objectionable, as a practical matter they simply represent the imperative conclusion of the doctor's competent expert opinion that the defendant's behavior was not related to any special psychiatric condition. The statement of the expert's conclusion in alternative terms constituted in this case no undue prejudice to the defendant.

At trial, the defendant did not object to the court's instructions to the jury at the conclusion of the guilt/innocence phase. However, on appeal, he faults the instructions in several respects.

■■■ First, it is argued that the trial court should have instructed on extreme emotional disturbance, and the lesser in-

cluded offense of manslaughter in the first degree. At the same time, appellant submits that the *absence* of extreme emotional disturbance is an element of the offense of murder, and therefore must be proved by the Commonwealth beyond a reasonable doubt. In *Wellman v. Commonwealth,* Ky., 694 S.W.2d 696 (1985), we stated that the "presence or absence of extreme emotional distress is a matter of evidence, not an element of the crime." And in *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980), we said:

> An instruction on murder need not require the jury to find that the defendant was not acting under the influence of extreme emotional disturbance unless there is something in the evidence to suggest that he was, thereby affording room for reasonable doubt in that respect.

We have also held that mental illness and extreme emotional disturbance are not the same thing, and that the latter becomes an issue only "when there is probative, tangible and independent evidence of initiating circumstances, such as provocation...." *Wellman, supra,* at 697. *Cf. McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986).

While the present record reveals considerable evidence of mental illness, we are unable to locate any evidence at all that the defendant was acting under the influence of extreme emotional disturbance at the time of the crimes in Madison County. The Commonwealth therefore had no burden to prove the absence of extreme emotional distress. Moreover, because a manslaughter instruction is proper only where there is evidence to support the giving of the instruction, the trial court's failure to instruct the jury on manslaughter in the first degree was not error. *See Wellman, supra; Gall, supra.*

Appellant further objects (now) that the trial court in its instructions failed to define reasonable doubt, to state the Commonwealth's burden of proof, and adequately to inform the jury of the presumption of innocence. With respect to reasonable doubt, we refer the appellant to the case of *Commonwealth v. Callahan,* Ky., 675 S.W.2d 391 (1984), and to RCr 9.56(2). With respect to the presumption of innocence and the prosecution's burden of proof, we refer the appellant to the trial court's instruction No. 9:

> *The law presumes the defendant to be innocent of a crime,* and the indictment shall not be considered as evidence or having any weight against him. You shall find the defendant in this case not guilty unless you are satisfied from the evidence alone, and *beyond a reasonable doubt,* that he is guilty. If upon the whole case you have a *reasonable doubt* that he is guilty, you shall find him not guilty. (Emphasis added.)

It is further submitted that the instructions failed to specify the burden of proof regarding the defense of insanity. The jury was instructed that it might find the defendant not guilty by reason of insanity if it believed "from the evidence" that he was insane at the time of the offenses. We find no error in this instruction. *See Gall v. Commonwealth,* Ky., 607 S.W.2d 97 at 110.

The appellant next would have it that the instructions were erroneous in failing to inform the jury of the consequences of a verdict of not guilty by reason of insanity, or a verdict of guilty but mentally ill. Such information would have been irrelevant and would have had "no legitimate bearing on the jury's factual determination of guilt or innocence." *Payne v. Commonwealth,* Ky., 623 S.W.2d 867 (1981); *Ice v. Commonwealth,* Ky., 667 S.W.2d 671 (1984). *Also see Edwards v. Commonwealth,* Ky., 554 S.W.2d 380 (1977). Where, as here, the jury has been properly instructed as to the verdicts it may return upon particular findings of fact, the argument that the jury, without information on consequences, cannot distinguish between the verdict of *not guilty* by reason of insanity and that of *guilty* but mentally ill is entirely unfounded.

Appellant next urges that inclusion in the instruction on insanity of the statutory language from KRS 504.020, that "the term mental disease or defect does not

include an abnormality manifested only by repeated criminal or otherwise antisocial conduct," had the effect of instructing that the defendant was presumed to be sane. We view the language complained of as merely stating a statutory limitation upon a statutory defense, requiring for a finding of insanity that there be some manifestation of abnormality other than repeated criminal conduct. The instruction exhibits no error in this respect.

Appellant insists that he was denied his rights to a fair trial and rational sentencing by improper and prejudicial comments made by the prosecutor during closing argument. In appellant's view, the prosecutor improperly ridiculed the insanity defense, misstated the law as to a presumption of sanity, demeaned the defendant, dwelt on evidence of other crimes, commented on the defendant's future dangerousness, and reenacted the crimes in an inflammatory fashion. We have carefully reviewed the prosecutor's argument to the jury, and, while we do not find it entirely commendable, neither do we find it exceeding acceptable bounds. In all respects complained of, the argument substantially addresses properly admitted evidence. The prosecutor's conduct cannot be characterized as so outrageous as to require reversal; certainly it does not fall into the category of argument condemned in our decisions in *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534 (1988), and *Morris v. Commonwealth*, Ky., 766 S.W.2d 58 (1989). *See also Marlowe v. Commonwealth*, Ky., 709 S.W.2d 424 (1986); *Tamme v. Commonwealth*, Ky., 759 S.W.2d 51 (1988).

### IV. TRIAL–PENALTY PHASE

■ The defendant did not object below to the trial court's instructions to the jury during the penalty phase. On appeal, however, he asserts a variety of errors in those instructions. The first complaint is that the court's charge to the jury, and indeed the verdict form signed by the foreman of the jury, contained the word "recommend" when referring to the jury's duty to fix a sentence. In *Tamme v. Commonwealth*, Ky., 759 S.W.2d 51 (1988), we held that, prospectively, "the word 'recommend' may not be used with reference to a jury's sentencing responsibilities in voir dire, instructions or closing argument." Because the trial of the present case was begun (and concluded) prior to our decision in *Tamme*, our review of this issue is to be conducted under the standard of *Ward v. Commonwealth*, Ky., 695 S.W.2d 404 (1985). Appellant argues that reversal is required by the following language in *Ward:*

> [S]hould any inadvertent reference implying a diminution of the jury's duty in fixing a death penalty creep into any case, the trial judge should immediately inform the jury that their duty to fix the death penalty should be considered as if there were no possibility of review by any source.

We do not believe that the standard in *Ward* requires that the use of the word "recommend," without more, implies a diminution of the jury's duty, necessitating an admonition. In *Ward*, the prosecutor stressed to the jury that their sentencing decision was *"only* a recommendation." He went on to emphasize that the trial court might not choose to impose the death sentence, that the sentence would automatically be reviewed by the Supreme Court, that the governor must sign the death warrant, and again "it is only, I want to point this out again to you, a recommendation." In the circumstances, we held that the prosecutor had clearly sought to divert the jurors from their true responsibility, by implying that the ultimate responsibility would lie elsewhere. Compare *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131 (1988), where, in the guilt/innocence instructions, the term "fix" appeared with respect to sentencing, while in the penalty instructions, the word "recommend" was used. We held, in essence, that the contrast between the terms "fix" and "recommend" implied to the jury that it did not bear final responsibility for imposition of the death penalty. In contrast to both *Ward* and *Grooms*, the present case discloses, apart from the mere use of the word "recommend," no emphasis or implication tending to diminish the jury's sense

of responsibility. We therefore find no reversible error.

Appellant contends that the trial court ought to have instructed the jury upon sundry non-statutory mitigating circumstances which were supported by the evidence, ranging from the fact that he had been abused as a child to the fact that he was a "nice, quiet boy." In fact, the court instructed the jury:

> [Y]ou shall consider such mitigating or extenuating circumstances as have been presented to you in evidence, including but not limited to [statutory mitigating circumstances].

We deem this instruction utterly sufficient, and the appellant's argument utterly meritless.

Appellant insists that, when imposing sentence, the trial court refused to consider non-statutory mitigating evidence. The basis for this contention appears to be that the trial judge's report fails to list, in the blank provided, any non-statutory mitigating circumstances in evidence. Assuming without conceding that the court in this case was obligated to consider non-statutory mitigating evidence, we find in the trial judge's report an act, as opposed to an omission, stating affirmatively that "based upon *all of the evidence* in this trial, I have no reason to disagree with the jury's recommendation ..." (Emphasis added.) Moreover, the court's final judgment and sentence of imprisonment states unequivocally that the court gave "due consideration to the evidence introduced at both stages of these proceedings and *the mitigating factors offered by the defendant....*" (Emphasis added.)

Returning to the instructions, appellant next proposes that the trial court should have peremptorily instructed the jury to consider in mitigation the factors of the appellant's youth (he was twenty-six) and the absence of a significant history of prior criminal activity. The instruction as given directed the jury to consider these factors if it believed from the evidence that they existed. We find the instruction correct.

■ Appellant further faults the penalty phase instructions for failing to require specific findings with regard to mitigating circumstances. Specific findings as to mitigating circumstances are not required by law or constitution. *Smith v. Commonwealth,* Ky., 734 S.W.2d 437 (1987); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

We have examined the remaining plethora of unpreserved objections to the trial court's instructions during the penalty phase. We find no merit in these issues and, rather than prolong this opinion with unnecessary discussion, refer the appellant to the decisions in *Harper v. Commonwealth,* Ky., 694 S.W.2d 665 (1985); *Smith v. Commonwealth,* Ky., 734 S.W.2d 437 (1987); *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985); and KRS 532.025.

■ Appellant alleges that the prosecutor was guilty of prejudicial misconduct during closing argument in the penalty phase of trial. Appellant points out that the prosecutor adverted to the defendant's lack of remorse and the prospect of his future dangerousness; resorted to name calling; and argued non-statutory aggravating factors (assaults on wife and alleged predisposition for violence). We have reviewed the entire closing argument, and find it indeed excessive in some particulars. However, we are not of the opinion that, absent the excesses, the jury's sentencing determination would have been any different.

The appellant complains further that the prosecutor in closing argument stated that the jury had already decided the question of aggravating circumstances, i.e., multiple deaths and murder committed in the course of robbery in the first degree. In fact, the jury had found the defendant guilty of both murders, and guilty of two counts of robbery in the first degree. We therefore see no prejudicial error in the prosecutor's comment. *See Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985).

■ Prior to formal sentencing, defense counsel indicated that the defendant might not be competent at this stage of the proceedings. Appellant argues that a competency examination was called for at this

time, as well as in the course of the trial. Prior to trial a psychiatric evaluation had been conducted, on the defendant's motion, at the Kentucky Correctional Psychiatric Center. The evaluation concluded that the defendant was competent to stand trial. On the first day of trial, defense counsel informed the court that he was "losing" the defendant, but did not move for a competency evaluation. Given the circumstances, that the pretrial evaluation had concluded that the defendant was not insane, and was competent to stand trial, we do not perceive that the court was presented with reasonable grounds to believe that the defendant lacked the capacity to appreciate the nature and consequences of the proceedings against him or to participate rationally in his defense. *See* RCr 8.06; *Henley v. Commonwealth*, Ky., 621 S.W.2d 906 (1981); *Pate v. Commonwealth*, Ky., 769 S.W.2d 46 (1989); *Mozee v. Commonwealth*, Ky., 769 S.W.2d 757 (1989). At sentencing, following counsel's intimations, the appellant acknowledged to the court that he understood that proceeding and the trial judge's role in imposing judgment. We conclude that the trial court was not required to order a competency hearing pursuant to RCr 8.06.

It is contended that the trial court, during the sentencing hearing, improperly considered the characteristics of the victims. The court remarked that the victims had no safeguards, and were given no opportunity to flee or to defend themselves. The court further commented that neither victim likely considered the probability of impending death, and added that neither of the victims "deserved the cold and cowardly manner in which they were executed...." The court's comments clearly have very little to do with the characteristics of the victims. Moreover, these remarks reflect no undue prejudice on the part of the trial court.

Appellant also asserts as error that the trial judge did not specifically find or consider mitigating factors, and moreover that he did not articulate what his sentencing role was. We have examined these arguments and do not find them to be cogent.

## V.  ACCUMULATION OF ERRORS

Appellant maintains that, even if no single error or irregularity occurring in the course of his trial constitutes grounds for reversal, nevertheless the accumulation of individually harmless errors deprived him of a fair trial. Considering the entire record and the totality of circumstances, we are persuaded that the defendant received not a perfect, but a fair trial. We find neither any particular error nor any combination of errors so prejudicial as to require reversal.

## VI.  CONSTITUTIONALITY OF DEATH PENALTY

In a series of issues, appellant assaults the constitutionality of Kentucky's death penalty scheme. Appellant suggests that he was subjected to double jeopardy, in that, after receiving twenty year sentences on the convictions for robbery in the first degree, the robberies were also used, as aggravating circumstances, to increase the punishment for his murder convictions. We do not agree that the penalty imposed upon the murder convictions was a second sentence upon the convictions for armed robbery. The fact that the murders were committed in the course of robbery assigned to the defendant a particular status, placing him within the category of persons against whom the death penalty might be imposed according to statute. The situation is analagous to that encountered under our persistent felony offender statute, where a convicted defendant who has been convicted of a prior felony may receive an enhanced sentence due to his status as a persistent felony offender. The enhanced sentence is imposed for the crime lately proven, and not for the prior felony. *Malicoat v. Commonwealth*, Ky., 637 S.W.2d 640 (1982). *See also Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

Appellant next insists that, in his case, mitigating factors "outweigh" aggravating factors, and further that his sentence is disproportionate to sentences received by other defendants in similar cases. He concludes that his death sentence therefore

constitutes cruel and unusual punishment. Under KRS 532.025(2), a sentencing jury is directed to give consideration to mitigating circumstances, as well as aggravating circumstances, supported by the record. Upon a finding beyond a reasonable doubt of the existence of an aggravating circumstance, the jury *may* fix the penalty at death. We may only conclude that the statute contemplates that the jury will weigh the mitigating circumstances in the process of arriving at an appropriate penalty. Upon review, we consider not only whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, but also whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. KRS 532.075(3)(a) and (c). This procedure, without requiring an express "weighing" of aggravating versus mitigating circumstances, effectively preserves a defendant's eighth amendment guarantees. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672 (1985); *Smith v. Commonwealth*, Ky., 599 S.W.2d 900 (1980).

Appellant also argues that he is prejudiced by an inability to obtain access to the data collected by this Court pursuant to KRS 532.075(6), in the course of proportionality review. Appellant need only refer to the death penalty decisions of this court in order to obtain the relevant data. *Harper v. Commonwealth*, Ky., 694 S.W.2d 665 (1985); *Smith v. Commonwealth*, Ky., 734 S.W.2d 437 (1987).

Appellant further asserts that this Court's method of proportionality review violates both the Federal Constitution and KRS 532.075(3)(c), in that "review of only post–1970 cases where the death penalty was both imposed and affirmed ... is not sufficient to determine if the death penalty is being applied in an arbitrary and capricious manner." Neither this bare, unelaborated assertion, nor the decisions in *White v. Commonwealth*, Ky., 671 S.W.2d 241 (1984), and the *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519 (1984), are persuasive on this point.

Next, appellant submits that proportionality review pursuant to KRS 532.075 is unconstitutional for lack of articulated standards used by this Court. It is also argued that the statute unconstitutionally delegates to the Court authority to determine criteria for proportionality review, and further that the Court is without constitutional authority to conduct such review. We deem it sufficient response to these arguments to note that proportionality review falls clearly within the constitutional appellate jurisdiction of this Court, and that determination of appellate matters according to law does not constitute an exercise of arbitrary power over the life of a convicted defendant. Unless we are constitutionally required to ignore our own previous decisions, and we do not believe that we are, the argument that, in the course of review, this Court "relies on matters outside the record on appeal," is baseless.

The remainder of the appellant's constitutional challenges, that the Commonwealth's death penalty law is unconstitutional on its face, that it operates in an arbitrary, discriminatory, and freakish manner, and that electrocution is cruel and unusual punishment, have repeatedly been presented, considered, and dismissed. *See Smith v. Commonwealth*, Ky., 734 S.W.2d 437 (1987); *White v. Commonwealth*, Ky., 671 S.W.2d 241 (1984); *Gall v. Commonwealth*, Ky., 607 S.W.2d 97 (1980); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

We have reviewed the entire record of the case, and have considered the punishment imposed as well as all errors enumerated by way of appeal. We have determined that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We further conclude that the evidence of record supports the jury's finding of statutory aggravating circumstances as enumerated in KRS 532.025(2). We have determined that the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar

cases,[10] considering both the crime and the defendant. We have reviewed all legal errors enumerated, and have concluded that no error or accumulation of errors substantially prejudiced the rights of the defendant. The verdict is substantiated by the facts of record, and the sentence is valid.

We affirm the convictions, and the sentences, including the sentences of death.

STEPHENS, C.J., and GANT, LAMBERT, VANCE and WINTERSHEIMER, JJ., concur.

LEIBSON, J., concurs in result only, and files a separate concurring opinion.

LEIBSON, Justice, concurring.

Respectfully, I concur in results only.

First, there were jurors who should have been excused for cause, but were not.

Second, the evidence of a similar offense in Lincoln County may well have been admissible in rebuttal as bearing on the insanity defense, *People v. Santarelli,* 49 N.Y.2d 241, 425 N.Y.S.2d 77, 401 N.E.2d 199 (1980), but it should not have been admitted during the Commonwealth's case-in-chief, because at that stage the highly inflammatory nature of the evidence far outweighed any probative evidentiary value.

Third, a jury should be instructed on the difference between a guilty but mentally ill and not guilty by reason of insanity verdict, because otherwise the difference is obscure and the instructions may be misleading. *Mitchell v. Commonwealth,* Ky., 781 S.W.2d 510 (1990), Leibson, J., dissenting. Here the defense did not specifically object to the instruction given at trial, so the issue may fail as a matter of trial tactics.

I concur in results with the Majority Opinion because this was not a close case. These errors were harmless beyond a reasonable doubt when considered in context and in light of the overwhelming evidence of premeditated, multiple murder.

**10.** Data have been compiled in accordance with KRS 532.075(6). We have considered all cases in which the death penalty was imposed after January 1, 1970: *Scott v. Commonwealth,* Ky., 495 S.W.2d 800 (1973); *Leigh v. Commonwealth,* Ky., 481 S.W.2d 75 (1972); *Lenston and Scott v. Commonwealth,* Ky., 497 S.W.2d 561 (1973); *Call v. Commonwealth,* Ky., 482 S.W.2d 770 (1972); *Caldwell v. Commonwealth,* Ky., 503 S.W.2d 485 (1972); *Tinsley and Tinsley v. Commonwealth,* Ky., 495 S.W.2d 776 (1973); *Galbreath v. Commonwealth,* Ky., 492 S.W.2d 882 (1973); *Caine and McIntosh v. Commonwealth,* Ky., 491 S.W.2d 824 (1973); *Hudson v. Commonwealth,* Ky., 597 S.W.2d 610 (1980); *Meadows v. Commonwealth,* Ky., 550 S.W.2d 511 (1977); *Self v. Commonwealth,* Ky., 550 S.W.2d 509 (1977); *Boyd v. Commonwealth,* Ky., 550 S.W.2d 507 (1977); *Gall v. Commonwealth,* Ky., 607 S.W.2d 97 (1980); *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519 (1984); *White v. Commonwealth,* Ky., 671 S.W.2d 241 (1983); *Harper v. Commonwealth,* Ky., 694 S.W.2d 665 (1985); *Skaggs v. Commonwealth,* Ky., 694 S.W.2d 672 (1985); *Kordenbrock v. Commonwealth,* Ky., 700 S.W.2d 384 (1985); *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1986); *Marlowe v. Commonwealth,* Ky., 709 S.W.2d 424 (1986); *Bevins v. Commonwealth,* Ky., 712 S.W.2d 932 (1986); *Halvorsen and Willoughby v. Commonwealth,* Ky., 730 S.W.2d 921 (1986); *Smith v. Commonwealth,* Ky., 734 S.W.2d 437 (1987); *Stanford v. Commonwealth,* Ky., 734 S.W.2d 781 (1987); *Slaughter v. Commonwealth,* Ky., 744 S.W.2d 407 (1988); *Simmons v. Commonwealth,* Ky., 746 S.W.2d 393 (1988); *Moore v. Commonwealth,* Ky., 771 S.W.2d 34 (1989). (In all cases preceding *Gall,* the death penalty was set aside for the reason that the statute under which the death penalties were imposed was invalid under *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).)