**Eugene Paul JOHNSON Appellant,**

v.

**COMMONWEALTH OF KENTUCKY Appellee.**

No. 2004–SC–000516–MR.

Supreme Court of Kentucky.

Dec. 22, 2005.

Rehearing Denied March 23, 2006.

Irvin Halbleib, Jr., Louisville, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Kenneth Wayne Riggs, Assistant Attorney General, Office of the Attorney General, Frankfort, Counsel for Appellee.

ROACH, Justice.

## I. INTRODUCTION

Appellant, Eugene Paul Johnson, was convicted of First–Degree Robbery by Complicity and of being a Second–Degree Persistent Felony Offender. On appeal, he makes four independent allegations of error: (1) that there was insufficient evidence to support his conviction; (2) that, during voir dire and in the presence of potential jurors, the prosecutor impermissibly defined the "reasonable doubt" stan-

dard; (3) that evidence of his alleged statements of intent to commit another robbery was improperly admitted; and (4) that the jury instructions were improper, violating his right to due process. Having found no error, we affirm Appellant's conviction.

## II. BACKGROUND

On December 29, 2003, between 9:00 and 9:30 p.m., Jason Brannock robbed Vette City Liquors ("liquor store") in Bowling Green. It is undisputed that Appellant accompanied Brannock to the liquor store, but he denies any culpability for the crime. The two men were arrested together at a service station just a few hours after the robbery when police recognized that Brannock's car matched the description of the getaway car used in the robbery.

Jeremy Poston and Wanda Ferguson, employees of the liquor store, were the first witnesses to testify, and they focused on the specific facts of the robbery. Although each of them had seen the perpetrator and observed that he was armed with a shotgun, neither could identify him because of the bandanas he wore on his head. Poston identified the getaway car and reported to police that the suspect had left in a red, late-model Chevrolet Cavalier with four doors. He did not observe or remember the car's license plate number. Poston and Ferguson also testified that the perpetrator had stolen money from both the cash register and Poston's wallet. Poston testified that the perpetrator had taken a payroll check as well.

Jason Brannock admitted his role in the crime and was the Commonwealth's principal witness in this case. He testified that he and Appellant had spent the afternoon together at Appellant's apartment. Brannock stated that earlier in the day, at approximately 6:00 p.m., he and the Appellant had driven to the liquor store where Appellant purchased a small bottle of whis-

key. He testified that on their trip back from the liquor store, he and Appellant had jokingly discussed the possibility of robbing such an establishment.

Later that evening, Brannock claimed that he asked Appellant to take him back to the liquor store. He testified that Appellant drove the car, a red 2002 Chevrolet Cavalier, which belonged to Brannock. Shortly after their arrest Brannock stated to police that he had driven the car to and from the liquor store during the robbery. Upon arriving at the liquor store, Brannock directed Appellant to drive by the liquor store, allowing him to determine if there were any customers inside, and to park the car in the back. After they parked, Brannock exited the car and donned a camouflage jacket and two bandanas, which he used to cover his face and head. Brannock testified that he also took a shotgun from the car. Brannock stated that the shotgun had been stowed beside his seat and was unknown to Appellant. He also testified that Appellant had no knowledge of his intention to rob the liquor store.

Brannock testified that after the robbery was complete, he returned to the car and informed Appellant that he had just robbed the liquor store. He claims that Appellant asked if he planned to turn himself in to the police. After he replied that he intended to do no such thing, Appellant then threatened to call the police if Brannock did not split the proceeds of the robbery with him. The two men drove to the parking lot of a nearby shopping mall and divided the money. Brannock stated that he then drove the car back to Appellant's apartment, where he changed clothes and disposed of most of the clothes he had worn during the robbery in an outdoor trash receptacle.

Later, the two left the apartment in Brannock's car. They were arrested after

two Kentucky State Police vehicles recognized Brannock's car in the parking lot of a service station. Poston was brought to the service station, but he could not identify the perpetrator. He did, however, identify Brannock's car as the one he had seen leaving the liquor store parking lot.

Miriam Hunter, Appellant's roommate, also testified for the Commonwealth. She stated that she arrived at the apartment she shared with the Appellant at approximately 8:45 p.m. on the night of the robbery. She testified that Brannock and the Appellant had arrived together a short time later and that both men were acting strangely. She also claimed Appellant gave her a small amount of money but would not disclose its source. Most significantly, she testified that she had previously overheard Appellant and Brannock discussing the possibility of robbing an area pawn shop.

Although Appellant declined to testify or present any evidence at trial, he did participate in a videotaped interview with Detective David Bragg, the lead investigator in the case. During that interview Appellant denied any prior knowledge or intent to commit the crime. He admitted that he had driven to the liquor store with Brannock, but he claimed that Brannock had been driving. He also stated that after they arrived he fell asleep in the car and was not awakened until Brannock returned and he announced he had just robbed the store. Another police officer testified that at the time of Appellant's arrest, a search of his person revealed $188.00 in cash. The case was submitted to the jury for a verdict at the close of the prosecution's case. The jury found Appellant guilty and he was sentenced to twenty years imprisonment. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## III.  ANALYSIS

### A.  Sufficiency of the Evidence

■ Appellant's primary argument is that there was insufficient evidence to support his conviction of First–Degree Robbery by Complicity. Appellant preserved the error with a timely motion for a directed verdict. The standard of review for a trial court's denial of a motion for directed verdict is set forth in *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky.1991). In that case we held:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Id.* at 187 (internal citations omitted).

Appellant argues that there was insufficient evidence for the jury to conclude that he had the requisite prior knowledge and intent necessary to justify his conviction for robbery by complicity. He argues that the evidence proved, at best, his guilt as an accessory after the fact to the robbery. We disagree. There was significant circumstantial evidence from which a jury could reasonably conclude that Appellant was guilty. Appellant and Brannock had discussed the possibility of committing a

similar crime at an area pawnshop.[1] On a visit to the site of the robbery earlier in the day, the two men joked about the possibility of robbing a liquor store. Upon returning to the liquor store that evening, Brannock instructed Appellant, who was driving Brannock's car, to park behind and to the side of the store. Brannock entered the liquor store wearing a camouflage jacket, a camouflage bandana on his head, and a red bandana covering his face. He was carrying a shotgun. Although Brannock testified that Appellant had no prior knowledge or intent that Brannock would commit the robbery, he admitted that he had donned this apparel and brandished the shotgun in the Appellant's presence immediately after exiting the car. The two men shared the proceeds of the crime. In light of this evidence and drawing all reasonable inferences in favor of the Commonwealth, the jury's verdict of guilt was clearly reasonable.

### B. Voir Dire Statement

Appellant next alleges that his conviction should be reversed because of the prosecutor's allegedly impermissible remarks concerning the reasonable doubt standard during voir dire. The entire voir dire statement, including, for context, the ensuing bench conference and the conclusion of that portion of the Commonwealth's presentation, is as follows:

*Attorney for the Commonwealth:*

Now ladies and gentlemen, this defendant, as he sits here, is entitled to the presumption of innocence. Every criminal defendant anywhere in the United States, including Kentucky, is entitled to the presumption of innocence. We in the Commonwealth, the prosecutor's office, we have no problem with that. We're all for it. That's been one of the main tenets of the criminal justice sys-

tem in the Anglo–Judeo–American law since the Middle Ages, since the Magna Carta. We don't have any problem with that.

Now, since he is entitled to the presumption of innocence, then it is—the burden is on the Commonwealth, if it can, to prove the case against Mr. Johnson, Eugene Paul Johnson.

Now, since we have that burden of proof we have to prove the case against him, and since he is entitled to the presumption of innocence, which the Judge will instruct you later that he is entitled to, we have to prove the case beyond a reasonable doubt. Now, everything is interactive these days. Let's try an interactive thing. Let me get a show of hands. How many have heard the term "Beyond a shadow of a doubt"?

[Prospective jurors respond.]

I think it's safe to say everybody raised their hand. Not surprisingly because this week, especially since I've mentioned it, you'll see it on the TV or you'll hear it on the radio, or you'll read it in the newspaper, or you'll read it in a novel or a book or something—beyond a shadow of a doubt. Now listen carefully. There ain't no such thing in the criminal justice system in the United States of America. That's one of the myths that has arisen. Nobody has to prove anything beyond a shadow of a doubt.

*Attorney for Appellant:*

Judge, can we approach? Judge, the law in Kentucky is clear that nobody can describe a reasonable doubt ...by saying that there is no such thing as a shadow of a doubt. That is defining reasonable doubt by ruling out alternatives, and I object to it.

*Trial Judge:*

---

**1.** Appellant's objection to the admission of

this evidence is discussed *infra* at Part III.C.

The voir dire question is—he isn't saying what reasonable doubt is. He's just saying what the law is not.

*Attorney for Appellant:*

But, by implication, he's—

*Trial Judge:*

I understand. And if I felt like he were going to cross that line I would sustain it. However, having heard this colloquy before, I know that we fall well short of that. But I understand the nature of that.

*Attorney for Appellant:*

Well, you understand that I haven't heard this colloquy before.

*Trial Judge:*

I understand that. And that's why I say I will overrule it.

*Attorney for the Commonwealth (continuing voir dire to the jury pool):*

As I was saying, the shadow of a doubt, I don't care how many times you've heard it, it's myth. *What the Commonwealth has to prove is the case beyond a reasonable doubt. Now, I can't tell you what a reasonable doubt is. The law won't let me. It won't let Mr. Brown. Believe it or not, even the Judge can't tell you what a reasonable doubt is in his instructions. That's up to you to determine. Whether or not the Commonwealth proves the case beyond a reasonable doubt.*

(Emphasis added).

In *Commonwealth v. Callahan*, 675 S.W.2d 391 (Ky.1984), we held: "trial courts shall prohibit counsel from *any* definition of reasonable doubt at any point in the trial, and any cases in this jurisdiction to the contrary are specifically overruled." *Id.* at 393 (emphasis in original). We reiterate that holding today.

In that same decision, however, we noted that the prosecutor stated:

Now I submit to you that [defense counsel's definition] is not reasonable doubt. Now, the judge has instructed you in the instructions on what reasonable doubt is. There is a little doubt about whether we are even here today. When I went to college I had some teachers that could practically prove to you that we weren't even here today. *But that's not what reasonable doubt is.* The judge has instructed you in the instructions as to what reasonable doubt is and you read that and follow it.

*Id.* at 392. (emphasis added). We concluded that the prosecutor's statement *did not constitute* "any attempt to define the phrase 'reasonable doubt,'...." *Id.* Thus, in the very case that announced the prohibition against defining reasonable doubt, we held that the prosecutor's allegedly improper statement, which, at most, attempted to show what reasonable doubt was *not*, did not amount to a violation of the rule against defining "reasonable doubt."

There is no difference between the prosecutor's discussion of reasonable doubt in *Callahan* and the prosecutor's short statement in this case that "beyond a shadow of a doubt" is not the same as "beyond a reasonable doubt." Notably, in this case the prosecutor went on to tell the jury pool that he could not define reasonable doubt because such a definition was up to them to determine.

Appellant also cites to *Marsch v. Commonwealth*, 743 S.W.2d 830 (Ky.1987). The comments in *Marsch*, however, differ significantly from those in this case. In *Marsch*, the prosecutor

engaged at length in a discussion of reasonable doubt. He asked [prospective juror] Kirk if he equated "beyond a shadow of a doubt" with "reasonable doubt." He provided an example using himself as a hypothetical witness to an accident and suggested to the prospec-

tive juror that his hypothetical testimony would satisfy the "reasonable doubt" standard, but might not eliminate any possibility of doubt. Finally, the attorney for the Commonwealth explained that there was a significant distinction between being convinced beyond a reasonable doubt and being convinced beyond all or a shadow of a doubt. *Id.* at 832. In *Marsch*, the prosecutor spoke at long length about the reasonable doubt standard. He even went so far as to provide a hypothetical, in which he was a witness, stating that while his testimony alone might satisfy the reasonable doubt standard, it could never eliminate all doubt. It should also be noted that the reversal in *Marsch* was not based on this error alone; we found multiple other errors in the jury selection.

■ In contrast, the prosecutor in this case simply informed the jury that the Commonwealth did not have to prove its case beyond a shadow of a doubt and that the proper standard was proof beyond a reasonable doubt. He offered no hypothetical to explain "beyond a reasonable doubt" and did not engage in a lengthy discussion of the standard. Furthermore, the prosecutor in this case told the jury that he could not define "reasonable doubt." He stated:

> Now, I can't tell you what a reasonable doubt is. The law won't let me. It won't let Mr. Brown. Believe it or not, even the Judge can't tell you what a reasonable doubt is in his instructions. That's up to you to determine. Whether or not the Commonwealth proves the case beyond a reasonable doubt.

Thus, even if his prior discussion of "beyond a shadow of a doubt" approached error, any prejudice was alleviated by this follow-up statement.

Additionally, even if one is convinced that the statement by the prosecutor in this case constituted error, that error was harmless. We have applied harmless error on this precise issue, even in capital murder cases, each time affirming a conviction and sentence of death. In *Sanders v. Commonwealth*, 801 S.W.2d 665, 671 (Ky.1990), we considered an objection under *Callahan* to a prosecutor's voir dire question. The question was: "In a criminal trial, do you realize that the Commonwealth has the burden of proving the defendant guilty beyond a reasonable doubt, that does not mean beyond all doubt or a shadow of a doubt?" We concluded, "[a]ssuming, without deciding, that an error would have occurred had objection been raised and overruled, we are wholly unconvinced, considering the circumstances, that absent this putative error the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed." *Id.* at 671 (internal footnote omitted).

*Sanders* was quoted approvingly in *Caudill v. Commonwealth*, 120 S.W.3d 635 (Ky.2003), another capital case, wherein we noted that "[t]he prosecutor's statement that 'just because there is a question or some unanswered part of the case, that there is automatically reasonable doubt' did not impermissibly define 'reasonable doubt.'" *Id.* at 675. Given our longstanding treatment of this issue, even in the most serious of cases, we conclude that the error alleged in this case was, at worst, harmless.

Finally, the dissent's suggestion that we have departed from the rule set forth clearly in *Callahan* is mistaken. To the contrary, this opinion explicitly reiterates that standard while concluding, just as the court did in *Callahan*, that the prosecutor's statements were not an impermissible definition of reasonable doubt. Likewise, our decision does not question the correctness of the cases which have relied on

*Callahan.* Quite simply, the foregoing is little more than the application of *Callahan,* and we neither reverse nor alter its rule today. Notwithstanding the suggestion of the dissent, trial counsel would be loathe to conclude otherwise.

### C. Statements of Intent to Commit Another Robbery

■ The trial court admitted the testimony of Appellant's roommate, Miriam Hunter, in which she stated that Appellant and Brannock had discussed, some time prior to the robbery, the possibility of committing a similar crime at a nearby pawn shop. It is well-established that determinations as to the relevance and admissibility of evidence are left to the sound discretion of the trial court. *Simpson v. Commonwealth,* 889 S.W.2d 781, 783 (Ky. 1994). Likewise, a judge's decision to admit certain evidence is subject to reversal only after a finding that the decision amounted to an abuse of discretion. *Love v. Commonwealth,* 55 S.W.3d 816, 822 (Ky. 2001). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999) (citing 5 Am.Jur.2d *Appellate Review* § 695 (1995)).

It is with this standard in mind that we must review Appellant's claim of error. He argues that the admission of Hunter's testimony was error because it was irrelevant and unduly prejudicial. The Commonwealth argues that the evidence was relevant, as evidence of Appellant's state of mind, and that its probative value substantially outweighed any prejudicial effect it might have had.

■ First, Appellant's argument that the evidence was irrelevant is simply without merit. Relevant evidence is defined in KRE 401 as "evidence having any tenden-cy to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The very nature of Appellant's defense—that he was merely present and was not complicit in the commission of the crime—requires that the jury consider issues of Appellant's knowledge and intent in deciding the case. Hunter's testimony, which tends to show that Appellant and Brannock discussed the possibility of committing a crime similar to the one at issue here, is clearly relevant to the Appellant's knowledge and/or intent.

■ Second, Appellant claims that the evidence was unduly prejudicial and should be barred because it was presented in order to show his propensity to commit the crime in violation of KRE 404(b). Appellant cites *Marshall v. Commonwealth,* 482 S.W.2d 765 (Ky.1972), where we held that it was reversible error to admit evidence of co-defendants' prior convictions to prove their propensity to burglarize a store. However, this case is clearly distinguishable on its facts. As discussed above, Hunter's testimony was submitted as evidence of Appellant's prior knowledge and/or specific intent on the night of the robbery and not for any prohibited purpose. Admission of evidence describing "other crimes, wrongs or acts" is permissible, "[i]f offered for some other purpose, such as proof of motive, opportunity, *intent,* preparation, plan, *knowledge,* identity, or absence of mistake or accident." KRE 404(b)(1) (emphasis added). As the evidence was introduced for a limited purpose, it was admissible under an exception to the general rule barring the introduction of evidence of other acts.

### D. Jury Instructions

■ Appellant argues that the jury instructions used at his trial were in error

and violated his right to due process. The allegedly erroneous instruction is as follows, with emphasis added:

*Instruction No. IV Robbery in the First Degree by Complicity*

You will find the Defendant guilty of Robbery in the First Degree by Complicity under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about December 29, 2003 and before finding of the Indictment herein, he, *alone* or in complicity with another, stole money and checks from Jeremy Poston;

B. That in the course of so doing and with intent to accomplish the theft, he, *alone* or in complicity with another, used or threatened the immediate use of physical force upon Jeremy Poston; AND

C. That when he, *alone* or in complicity with another, did so, they were armed with a shotgun.

Appellant claims that inclusion of the word "alone" in the jury instructions effectively allowed the jury to convict him *either* as an accomplice, as he was charged, *or* as a principal, though he was not charged as such. Appellant admits that this error was not properly preserved at trial, but he insists we review it as palpable error pursuant to RCr 10.26.

To review an unpreserved error under this rule, the error must be palpable, must affect the substantial rights of the defendant, and must result in manifest injustice. RCr 10.26; *see also Nichols v. Commonwealth,* 142 S.W.3d 683, 691 (Ky. 2004). The Commonwealth conceded in its brief that no evidence was introduced proving that Appellant acted as a principal in the robbery. In fact, the Commonwealth's arguments at trial premised Appellant's culpability for the crime *solely* on the theory of complicity. The prosecutor made statements during both voir dire and during his opening statement to the jury that Appellant never entered the store and waited in the car during the robbery. In short, there was neither any suggestion by the Commonwealth nor any evidence presented on which a reasonable juror could conclude that Appellant had acted as a principal in the robbery. Given these circumstances, we conclude that any error in the jury instructions was not palpable, did not affect Appellant's substantial rights, and did not result in manifest injustice.

## IV. CONCLUSION

For the foregoing reasons, Appellant's conviction is affirmed.

GRAVES, JOHNSTONE, SCOTT and WINTERSHEIMER, JJ., concur.

COOPER, J., dissents by separate opinion in which LAMBERT, C.J., joins.

COOPER, Justice, dissenting.

"Those who cannot remember the past are condemned to repeat it." George Santayana, *The Life of Reason or The Phase of Human Progress* 284 (2d ed.1924).

[A]ll counsel shall refrain from any expression of the *meaning* or definition *of the phrase "reasonable doubt."*

*Commonwealth v. Callahan,* 675 S.W.2d 391, 393 (Ky.1984). Unfortunately, those who have joined the majority opinion in this case either have forgotten or choose not to remember what led this Court to that ruling. As noted in *Callahan, id.* at 392, that case was simply "part of the progeny spawned by *Taylor v. Kentucky,* 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978)."

In *Merritt v. Commonwealth*, 386 S.W.2d 727 (Ky.1965), our predecessor court had addressed the issue as follows:

> There have been many definitions of reasonable doubt, and we are not so presumptuous as to fancy we can coin a better one here. But it should be observed that a *reasonable* doubt cannot mean *any* doubt. There is *some* doubt about everything. A reasonable doubt is a substantial doubt, a real doubt, in that the juror must ask himself not whether a better case might have been proved, but whether after hearing the evidence the juror himself actually doubts that the defendant is guilty.

*Id.* at 729.

Presumptuous or not, our predecessor court subsequently amended RCr 9.56 to adopt the *Merritt* definition and require that juries in every criminal case be instructed, *inter alia,* as follows:

> If upon the whole case you have a reasonable doubt as to the defendant's guilt, you will find him not guilty. The term "reasonable doubt" as used in these instructions means a substantial doubt, a real doubt, in that you must ask yourself not whether a better case might have been proved but whether after hearing all the evidence you actually doubt that the defendant is guilty.

In *Taylor,* the issue was not whether this instruction properly defined "reasonable doubt" but whether it was also necessary to instruct the jury on the presumption of innocence. Following existing Kentucky precedent, our Court of Appeals had held that "as long as the trial court instructs the jury on reasonable doubt an instruction on the presumption of innocence is not necessary." *Taylor v. Commonwealth,* 551 S.W.2d 813, 814 (Ky.App.1977) (citing *Swango v. Commonwealth,* 291 Ky. 690, 165 S.W.2d 182 (1942); *Mink v. Commonwealth,* 228 Ky. 674, 15 S.W.2d 463 (1929)).

We denied discretionary review, but the United States Supreme Court granted certiorari. *Taylor v. Kentucky,* 434 U.S. 964, 98 S.Ct. 502, 54 L.Ed.2d 449 (1977).

In holding that it was prejudicial error to refuse to instruct the jury on the presumption of innocence, the U.S. Supreme Court characterized the trial court's instructions as "skeletal" and "Spartan." *Taylor v. Kentucky,* 436 U.S. 478, 486, 98 S.Ct. 1930, 1935, 56 L.Ed.2d 468 (1978). The Court noted further that the trial court's "truncated discussion of reasonable doubt ... was hardly a model of clarity" and "often has been criticized as confusing." *Id.* at 488, 98 S.Ct. at 1936. The Court proceeded to hold that the failure to separately instruct the jury on the presumption of innocence, especially in light of the "confusing" definition of reasonable doubt coupled with certain inherently misleading assertions made by the prosecutor during opening and closing arguments, denied the accused his right to due process of law. *Id.* at 486–90, 98 S.Ct. at 1935–38.

Rather than attempt to formulate a new, less "confusing" definition of "reasonable doubt," our predecessors on this Court "[threw] in the towel," *Whorton v. Commonwealth,* 570 S.W.2d 627, 631 (Ky.1978), *rev'd, Kentucky v. Whorton,* 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979), and amended RCr 9.56 to read:

> (1) In every case the jury shall be instructed substantially as follows:
>
> "The law presumes a defendant to be innocent of a crime, and the indictment shall not be considered as evidence or as having any weight against him or her. You shall find the defendant not guilty unless you are satisfied from the evidence alone and beyond a reasonable doubt that he or she is guilty. If upon the whole case you have a reasonable doubt that he or she is guilty, you shall find him or her not guilty."

(2) *The instructions should not attempt to define the term "reasonable doubt."*

(Emphasis added.)

That, of course, did not prevent prosecutors and defense counsel from formulating their own sometimes elaborate explanations of what was or was not a "reasonable doubt" during voir dire, opening statements, and closing arguments.[1] In fact, our predecessor court probably invited this practice when it said in *Cox v. Cooper,* 510 S.W.2d 530 (Ky.1974): "Our approach to instructions is that they should provide only the bare bones, which can be fleshed out by counsel in their closing arguments if they so desire." *Id.* at 535. Thus, in *Callahan,* defense counsel defined "reasonable doubt" as "any doubt," and the prosecutor told the jury that "[t]here is a little doubt about whether we are even here today." *Callahan,* 675 S.W.2d at 392. Noting the incongruity of prohibiting trial judges from defining "reasonable doubt" while permitting the parties to invent their own self-serving definitions, the Court extended the RCr 9.56(2) prohibition against attempting to define "reasonable doubt" to trial counsel.

> Having prohibited the court from definition of the term "reasonable doubt" in the instructions by RCr 9.56(2), we can hardly condone a client-serving definition by defense counsel or prosecutor in either voir dire, opening statement or closing argument. As stated in *Taylor, supra [Taylor v. Kentucky,* 436 U.S. at 488–89, 98 S.Ct. at 1936], "... arguments of counsel cannot substitute for instructions by the court." We do not intend by this holding that counsel can-

not point out to the jury which *evidence,* or lack thereof, creates reasonable doubt, but all counsel shall refrain from any expression of the *meaning* or definition of the phrase "reasonable doubt." As stated in Wigmore, *supra* [9 Wigmore, *Evidence,* § 2497 (Chadbourn rev. 1981) ], page 408:

> The effort to perpetuate these elaborate unserviceable definitions is a useless one and serves today chiefly to aid the purpose of the tactician. It should be abandoned.

*Id.* at 393 (emphasis added).

In *Sanborn v. Commonwealth,* 754 S.W.2d 534 (Ky.1988), we held that "[t]he prosecutor improperly defined reasonable doubt to the jury," *id.* at 544, but did not recite the nature of the remark. However, in *Marsch v. Commonwealth,* 743 S.W.2d 830 (Ky.1987), we held that a "clear-cut violation" of *Callahan* occurred when the prosecutor told a juror during individual voir dire that "there was a significant distinction between being convinced beyond a reasonable doubt and being convinced beyond all or a shadow of a doubt." *Id.* at 832–33.

As in *Marsch,* the prosecutor in the case *sub judice* undertook to express the *meaning* of "reasonable doubt" (not which *evidence* or lack thereof created reasonable doubt) by informing the jurors during voir dire, over Appellant's objection, that "beyond a reasonable doubt" does not mean "beyond a shadow of a doubt."

> Let me get a show of hands. How many have heard the term "beyond a shadow of a doubt"?

> (Prospective jurors respond by raising their hands.)

---

1. I remember one particularly tedious closing argument during which defense counsel attempted to explain the meaning of "reasonable doubt" by telling the jurors to imagine a giant curtain across the courtroom that blocked their view of the witness stand, then gradually opening the imaginary curtain while informing the jurors that even that much blockage constituted a reasonable doubt.

I think it's safe to say everybody raised their hands.... Now listen carefully. There ain't no such thing in the criminal justice system in the United States of America. That's one of the myths that has arisen. Nobody has to prove anything beyond a shadow of a doubt.

. . . .

... [T]his "shadow of a doubt," I don't care how many times you've heard it. It's a myth. What the Commonwealth has to prove is a case beyond a reasonable doubt.

The majority opinion's reliance on *Caudill v. Commonwealth*, 120 S.W.3d 635, 675–76 (Ky.2003), and *Sanders v. Commonwealth*, 801 S.W.2d 665, 671 (Ky.1990), is misplaced. Unlike the case *sub judice*, there was not a contemporaneous objection to the prosecutor's discussion of the *meaning* of reasonable doubt in either *Caudill* or *Sanders*. In both cases, we applied the standard of review for unpreserved errors in death penalty cases and held that "we are wholly unconvinced, considering the circumstances, that absent this putative error the [appellants] may not have been found guilty of a capital crime, or the death penalty may not have been imposed." *Caudill*, 120 S.W.3d at 675–76; *Sanders*, 801 S.W.2d at 671.

With today's decision, we have regressed to where we were in 1978. Trial courts cannot instruct juries as to the meaning or definition of "reasonable doubt," but prosecutors and defense counsel can urge juries to adopt their own client-serving definitions (for surely this Court is not holding that a prosecutor can tell the jury its version of the meaning of reasonable doubt but defense counsel cannot). If jurors are to be instructed on the meaning or definition of reasonable doubt, the instruction should come from the neutrality of the bench, not the advocacy of counsel. However, I believe *Callahan*

struck the right chord, as one can only surmise what definition would pass constitutional muster. *Taylor* was not the last case reversed by the United States Supreme Court because of an improper definition of "reasonable doubt." In *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), *abrogated on other grounds by Estelle v. McGuire*, 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 482 n. 4, 116 L.Ed.2d 385 (1991), the Court held that it was reversible error for a state court to instruct the jury as follows:

"[A reasonable doubt] is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. *It must be such doubt as would give rise to a grave uncertainty*, raised in your minds by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. *It is an actual substantial doubt.* It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty."

*Id.* at 40, 111 S.Ct. at 329. I perceive no real distinction between an "absolute or mathematical certainty" and "beyond a shadow of a doubt." If a trial court cannot instruct a jury that "reasonable doubt" does not mean "beyond a shadow of a doubt," then a prosecutor should not be allowed to do so.

Accordingly, I dissent.

LAMBERT, C.J., joins this dissenting opinion.