# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: FEBRUARY 16, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0448-MR

GARY PUGH                                                      APPELLANT

           ON APPEAL FROM MCCRACKEN CIRCUIT COURT
V.              HONORABLE TIMOTHY KALTENBACH, JUDGE
                       NO. 20-CR-0399

COMMONWEALTH OF KENTUCKY                             APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A McCracken Circuit Court jury convicted Gary Pugh of first-degree assault, first-degree rape, and first-degree sexual abuse. Pugh was also found to be a persistent felony offender in the first-degree. The jury recommended a sentence of life imprisonment which the trial court then imposed. Pugh now appeals as a matter of right.[1] He argues the trial court committed reversable error when it denied his motion for directed verdict on the charge of first-degree assault. He also argues he was prejudiced by statements made by the Commonwealth during voir dire concerning the concept of proof beyond a

---

[1] Ky. Const. § 110(2)(b).

reasonable doubt. Upon review, we find no error and hereby affirm the judgment of the McCracken Circuit Court.

## I. FACTS AND PROCEDURAL BACKGROUND

Seventy-nine-year-old Wanda Burton lived on Ward Street in Paducah for the last fifteen years with her pet dog. Prior to this incident, she was diagnosed with cancer of the eye and had undergone chemotherapy and radiation treatment. Wanda had been recently hospitalized three times for a period of one week each time. She sustained a cracked hip from falling and at least one of the hospitalizations was because of her cracked hip.

Wanda lived next door to Shawn and Jenny Beach. Shawn helped Wanda with various household repairs and his wife and daughter visited occasionally. Wanda would be invited over to eat supper with the Beaches and would sometimes watch their daughter.

Wanda had been a member of the Victory Assembly of God church for approximately twenty years. She attended church faithfully until her ill-health kept her from attending services. Church is where she met Appellant Gary Pugh. Wanda and Pugh had been communicating over Facebook messenger for some time prior to Pugh's arrival to Wanda's home in July of 2020. They discussed mostly God and her cancer. Pugh had offered to come over and pray with Wanda about her cancer, but Wanda never felt well enough to have any company.

On July 20, 2020, Gary again asked Wanda if he could come over to give her anointment oil and pray for her eye. This time, Wanda agreed. Pugh's

2

friend Cole Hoppman gave him a ride over to Wanda's house and waited in the car for him to return.

On warm days Wanda would typically open her front door but leave the screen door shut and locked. When Gary came over that evening, around 7:30 p.m., he went inside and shut the front door and locked it. Pugh gave Wanda a hug and sat down in her rocking chair. Pugh asked Wanda where she kept her anointing oil. Wanda replied that she kept the oil in the kitchen and went to retrieve it. Pugh followed her. When Wanda told him she did not need his help, he grabbed her hands and pulled her into her bathroom locking the door behind him.

Pugh got Wanda down on the bathroom floor and hit her head on the bathtub. Pugh beat her with his fists on her face and around her eye that was afflicted with cancer. He broke her nose and caused her to sustain a facial fracture around her eye socket. He grabbed her head by the hair and slammed it into the tile floor. Wanda tried to fight back by kicking Pugh. He told her, "If you don't quit, I could kill you." He pulled up her blouse and pushed her bra up and began sucking her right breast. He tore at her shorts, ripping them open at the crotch. He attempted to put his penis into her vagina, but he was unable to achieve an erection, so he inserted his finger instead causing abrasions to her inner labia and inside her vagina. There was also a tear in the skin between her vagina and rectum.

While the assault was occurring, Wanda's neighbor, Jenny Beach had noticed a strange car parked on the wrong side of the street behind a bush.

3

Jenny sent her husband Shawn to investigate. Shawn saw Cole Hopman sitting in the driver's seat. Hopman told Shawn he gave a friend a ride to pray with Wanda. Shawn was suspicious because the car was not parked in the driveway. When Shawn went to knock on Wanda's door, he noticed the door was shut, which Wanda rarely did when the weather was warm. He knocked even louder when he heard no reply. When Wanda heard Shawn knocking, she screamed. Pugh stopped his assault, put on his pants, and ran for the front door. When Shawn heard Wanda scream, he was about to kick the door in when Pugh ran out through the door saying "She fell. She fell. She fell."

Shawn told Pugh to stay where he was while he checked on Wanda. When he saw Wanda, her face was severely bruised, mostly around her eye, and her lip was lacerated. She told him Pugh beat her and tried to rape her. Shawn told his wife to call the police and Pugh handed him his phone and told Shawn to call the cops. Shawn went over to Cole Hopman's car and retrieved the keys from the vehicle.

When McCracken County Sheriff's Deputy Aiden Pedgrim arrived at the scene, there were several people around who were very upset with Pugh. He placed Pugh in his cruiser to separate him from the others. Pugh initially told Deputy Pedgrim that he went over to Wanda's house to pray and that she fell. Pugh later told him that Cole Hopman was the person who assaulted Wanda.

Detective Martin was the lead investigator. She took pictures at the hospital and of Wanda's residence. She also took pictures of Pugh's superman ring that appeared to match the injuries on Wanda's face. Detective Martin

4

discovered Pugh's watch in Wanda's bathroom. When she asked Pugh about it, he said it was because he was trying to rescue Wanda from Hopman.

At the hospital, Sexual Assault Nurse Examiner (SANE) Emily Honey performed an examination and collected a Sexual Assault Forensic Evidence (SAFE) kit from Wanda. Nurse Honey collected swabs from Wanda's cheek, breast, and pelvic area and performed a pelvic exam. She testified the trauma and abrasion to Wanda's vagina and labia were consistent with a sexual assault. A buccal swab was taken from Pugh which Hunter Stanley from the Kentucky State Police Western Crime Lab testified matched the DNA profile from the saliva sample taken from Wanda's right breast.

Dr. Jeremy Klope treated Wanda that day at the Mercy Lourdes Emergency room. He testified that Wanda sustained a laceration on her lip which required stitches and had swelling around her eye. He performed a CT scan which indicated she had a nasal and facial fracture as well as bleeding within her nasal cavity. Dr. Klope testified most of the trauma Wanda sustained was around her eyes. Wanda at the time of the trial was still unable to breathe properly through the left side of her nose unless she pressed the other side closed. Her nose continuously runs, and she would have to have surgery to repair her nose in order for it to function properly.

Pugh testified at trial and his version of events differed both from Wanda's version and his previous statements. He told the jury that he went to Wanda's house that day to give her an estimate on cutting her grass, after which he went to wash his hands in her bathroom and accidently left his watch

5

there. Later that day, he told the jury, he went back to Wanda's house to pray with her. When he entered her house, he shut and locked her door out of force of habit. When he gave Wanda a hug, he sneezed on her chest because of his allergies. Wanda went to get the anointment oil, and according to Pugh, fell. Pugh went to help her, and she told him not to touch her. When Wanda went to the bathroom she fell and hit her face. Pugh testified that as he tried to help her again, she pushed him away. Pugh said she fell a total of four times and the last time he tried to help, she tore her shorts. Pugh said he told a different version of events previously because he was scared.

Pugh was initially indicted on September 21, 2020, for first-degree unlawful imprisonment, second degree assault, first-degree rape, and first-degree sexual abuse. The Commonwealth sought, and the grand jury returned, a superseding indictment on March 18, 2021, amending the second-degree assault to first-degree and adding a persistent felony offender in the first-degree charge. The Commonwealth agreed to dismissal of the unlawful imprisonment charge after the close of evidence. At trial, after the close of the Commonwealths' case and at the close of evidence, Pugh made a motion for a directed verdict on the charge of assault in the first degree and the other charges. Pugh argued that there was insufficient evidence presented by the Commonwealth for a reasonable jury member to conclude that Wanda had sustained a serious physical injury as required for a conviction of assault in the first-degree. The trial court denied the motions and the case went to the jury. The jury found Pugh guilty of assault, rape, and sexual abuse in the first-

6

degree. The jury also found Pugh to be a persistent felony offender in the first-degree and recommended a sentence of life imprisonment. The trial court followed the recommendation of the jury and sentenced Pugh accordingly. This appeal followed. We now discuss the merits of the appeal.

## II. ANALYSIS

Pugh argues the trial court erred by not granting his directed verdict motion on the charge of assault in the first-degree. He also argues his rights were substantially prejudiced by the Commonwealth's comments during voir dire regarding proof beyond a reasonable doubt. While Pugh's first issue is preserved, he concedes that his second issue is unpreserved.

### A. The Trial Court did not err when it denied Pugh's motion for a directed verdict on assault in the first-degree.

Pugh argues that the Commonwealth did not present enough evidence during trial to show that Wanda had sustained a serious physical injury during the assault and, as such, the trial court should have granted a directed verdict on that charge. This Court has previously stated that:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). On appellate review, the test of a directed verdict is, if under the evidence as a whole, it

7

would be clearly unreasonable for a jury to find guilt, only then is the defendant entitled to a directed verdict of acquittal. *Id.*

Pugh was convicted of assault in the first-degree, a class B felony. The relevant portion of Kentucky Revised Statute (KRS) 508.010(1)(a) states that a person is guilty of assault in the first degree when he "intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument[.]" Pugh argues that the Commonwealth failed to prove beyond a reasonable doubt that Wanda sustained a serious physical injury as required under the statute. Serious physical injury is an essential element of assault in the first-degree. KRS 500.080 (17) defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ."

This Court has consistently held that medical testimony is not required to prove serious physical injury and that the victim is certainly competent to testify about their own injuries. *Commonwealth v. Hocker,* 865 S.W.2d 323, 325 (Ky. 1993). However, in order to prove a serious physical injury, we require a "fairly strict level of proof." *Prince v. Commonwealth,* 576 S.W.2d 244, 246 (Ky. App. 1978). It is undisputed that Wanda suffered from a broken nose and facial fracture. At the time of the trial, almost one year after the assault she was still suffering from a deviated septum caused by her nasal fracture. Her nose continuously ran, and she could not breathe normally through her nose as she once had prior to the assault.

8

Our Court of Appeals, when weighing whether an eleven-month-old child

had suffered a serious physical injury when the defendant in that case broke

her humerus,[2] surveyed other jurisdictions and found:

> [W]hether a single type of injury involving broken bones constituted sufficient bodily injury to support aggravated assault have generally found them sufficient under the facts or evidence presented at trial where the victim suffered a broken ankle, arm, back, **cheek bone**, collarbone, finger, hand, jaw, leg, **nose**, rib, shoulder, and skull.

*Clift v. Commonwealth,* 105 S.W.3d 467, 470-71 (Ky. App. 2003) (citing Tracy A.

Bateman, J.D., Annotation, *Sufficiency of Bodily Injury to Support Charge of*

*Aggravated Assault,* 5 A.L.R.5th 243 (1992)). (Emphasis added.)

This Court has also held that the seriousness of the physical injury is

dependent on the characteristics of the victim. *Schrimsher v. Commonwealth,*

190 S.W.3d 318, 329 (Ky 2006). In *Clift,* as in *Schrimsher,* the victims in both

cases were especially vulnerable since both were infants under the age of one.

Infants are especially vulnerable in ways that adults are not. And while Wanda

still enjoys mobility and is able to fend for herself, she too, is at an equally

vulnerable stage of life. In some ways, perhaps more so. Having suffered

through cancer and several hospitalizations in the near past, and having

cracked her hip from falling, her ability to recover from trauma is arguably less

than that of a child. At the time of the trial, approximately eleven months after

the attack, her nose still did not function normally. This certainly is a

prolonged loss or impairment of the function of a bodily organ. Pugh argues

---

[2] Humerus is the upper arm bone, colloquially known as the funny bone.

9

that she could have had surgery to repair her deviated septum and have a fully functioning nose if only she chose to do so. Pugh, impliedly so, urges this Court to consider her failure to surgically remedy her affliction, akin to a type of contributory negligence, or waiver of some sort. Pugh has cited no case law to support this position. And while Pugh's concern for Wanda's health, howsoever belatedly acquired, is certainly grounds for this Court to be optimistic regarding his prospects for rehabilitation, this Court will not sanction a rule saddling the victim with such a burden. There may be a plethora of reasons why a surgery is delayed or not undertaken by a victim. For no surgery is without risk, especially for a lady of advanced years recovering from cancer and rape and a horrific assault. Therefore, the trial court committed no error when it denied the motion for a directed verdict on the assault in the first-degree charge.

## B. The Commonwealth's statements concerning reasonable doubt did not cause a manifest injustice requiring reversal.

Pugh also argues that the Commonwealth made impermissible statements defining the concept of reasonable doubt. During voir dire, the Commonwealth made the following statement about reasonable doubt:

> None of us can tell you what reasonable doubt is. We can't give a specific definition. I can tell you a little bit about what it's not. It's not proving guilt beyond any doubt, beyond a shadow of a doubt, but beyond a reasonable doubt. There's a distinction there, it's not beyond any doubt, it's not beyond a shadow of a doubt, it's beyond a reasonable doubt. Reasonable and doubt are commonly used words that you in your good common sense and experience can take care of and define at the time you render a verdict.

10

As Pugh concedes in his brief, this issue is unpreserved. Consequently, this Court will review this issue using the palpable error standard under RCr[3] 10.26. *Early v. Commonwealth,* 470 S.W.3d 729, 737 (Ky. 2015). For an error to be palpable it must be "easily perceptible, plain, obvious and readily noticeable." *Brewer v.Commonwealth,* 206 S.W.3d 343, 349 (Ky. 2006). An unpreserved error may be corrected on appeal if failure to do so would cause a manifest injustice. *Commonwealth v. Goss,* 428 S.W.3d 619, 626-627 (Ky. 2014). This is an error that if it remained uncorrected, there would be a likelihood of a different result, or call into question the defendant's right to due process. *Id.* at 627.

We have held that trial courts should prohibit counsel from offering any definition of reasonable doubt during any phase of the trial. *Commonwealth v. Callahan,* 675 S.W.2d 391, 393 (Ky. 1984). And we held that reversal is required should there be an actual violation of this rule. *Simpson v. Commnwealth,* 759 S.W.2d 224, 226 (Ky. 1988). However, we have held there was no error when the prosecutor commented during voir dire the Commonwealth had the burden to prove their case beyond a reasonable doubt and not beyond a shadow of doubt. *Johnson v. Commonwealth,* 184 S.W.3d 544, 549 (Ky. 2005). When discussing the rule *Callahan* expounded, this Court, in *Johnson,* pointed out the factual similarities between that case and *Callahan. Id.* at 549. We noted in both cases a prosecutor's attempt to define what reasonable doubt is **not** should not be considered error. And later on, this

---

[3] Kentucky Rules of Criminal Procedure.

Court held that a similar statement did not constitute palpable error when the issue went unpreserved. *Cuzick v. Commonwealth,* 276 S.W.3d 260, 268 (Ky. 2009).

The comments made by the prosecutor in this case are essentially the same as those made in *Johnson* and *Cuszick.* In *Johnson,* even though the issue was preserved by contemporaneous objection, we found no error. *Johnson,* 184 S.W.3d at 549. And since Pugh, as in *Cuzick,* failed to preserve the issue, we find no error, palpable or otherwise. Aside from the testimony of Pugh, which the jury apparently found unconvincing, the evidence was overwhelming on the issue of Pugh's guilt. There is no manifest injustice here which would require reversal of the conviction.

## III. CONCLUSION

Based on the foregoing, we find that the McCracken Circuit Court committed no error when it denied Pugh's motion for a directed verdict on the charge of assault in the first-degree. Likewise, upon review of the comments made by the prosecutor during voir dire, we find no manifest injustice and therefore no grounds for reversal of the conviction. We hereby affirm the judgement of the trial court.

All sitting. All concur.

COUNSEL FOR APPELLANT

Roy Alyette Durham II
Assistant Public Advocate

COUNSEL FOR APPELLEE

Daniel J. Cameron
Attorney General of Kentucky

Jenny L. Sanders
Ken W. Riggs
Assistant Attorneys General